1

2

3

4                      UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    DIANA C. WATSON,                        Case No.  19-cv-05627-WHO

              Plaintiff,
8
                                             ORDER ON MOTIONS FOR
9         v.                                 SUMMARY JUDGMENT

10   ANDREW SAUL,

              Defendant.
11

12         The parties have filed cross-motions for summary judgment in this Social Security appeal.

13   Although Administrative Law Judge David Q. LaBarre ("ALJ") found that plaintiff Diana Watson

14   was disabled from June 8, 2014 through January 13, 2016, he concluded that her medical

15   condition improved and she was not disabled thereafter.  But he failed to explain how and why

16   Watson's schizophrenia and anxiety disorder had improved to the extent that she could work, and

17   as explained below, he improperly weighed the medical evidence and Watson's subjective

18   testimony.  After reviewing the parties' papers and the administrative record, I GRANT plaintiff's

19   motion, DENY defendant's motion, and REMAND for further proceedings consistent with this

20   ORDER.

21                                 BACKGROUND

22   I.    PROCEDURAL HISTORY

23         On August 31, 2014, Watson applied for Supplemental Security Income ("SSI") under

24   Title XVI of the Social Security Act, with an alleged onset date of June 8, 2014.  Administrative

25   Record ("AR") 15, 68.  Her application was denied initially and again on reconsideration.  AR 94-

26   98, 110-114.  She requested a hearing and appeared before the ALJ on January 24, 2018.  AR 116-

27   118, 36-67.  On August 15, 2018, the ALJ issued a partially favorable decision, finding that

28   Watson was disabled from June 8, 2014 through January 13, 2016 ("closed period") but that

United States District Court
Northern District of California

medical improvement occurred and beginning January 14, 2016, Watson was no longer disabled. AR 12-31. That decision became the Commissioner's final decision when the Appeals Counsel declined review on July 11, 2019. AR 1-3. On September 6, 2019, Watson filed this action for judicial review pursuant to 42 U.S.C. § 405(g). Dkt. No. 1.

Now pending before me are Watson's motion for summary judgment, filed March 17, 2020, and the Commissioner's cross-motion for summary judgment, filed May 14, 2020. Dkt. Nos. 18, 21.

## II. WATSON'S IMPAIRMENTS AND TREATMENTS

When Watson applied for SSI on August 31, 2014, she claimed her disability dated to her first psychotic episode in June 2014, when she was admitted to John George Psychiatric Pavilion after her husband reported that she was suicidal and severely detached from reality. AR 278. Her initial Mental Status Exam ("MSE") revealed that she was disheveled, pacing purposelessly, with blunted affect, loose association, intact cognition, and poor insight and judgment. *Id.* She admitted to hearing voices and reported attempting suicide by trying to climb into a trash can. *Id.* She "required inpatient hospitalization for safety and stabilization." AR 281, 335. She was actively psychotic for the first five days of hospital stay, "very disorganized, internally preoccupied with blank stares and self-talking." AR 278. She was discharged after 10 days, with diagnosis of Psychotic Disorder, Not Otherwise Specified ("Psychotic Disorder NOS"), medications of Benadryl (daily) and Risperdal (daily), and an outpatient referral to South County Crisis Response Program ("SCCRP"). AR 277-278.

On June 25, 2014, Watson had an intake evaluation at SCCRP and was observed to have hesitant speech, constricted affect, impaired concentration, blocking thought process, delusional thoughts, impaired to mild judgment, depressed mood, and hallucinations. AR 352-354. She was diagnosed with Psychotic Disorder NOS and probable Schizophrenia vs. Schizoaffective Disorder, Depressed Type. AR 354. She exhibited a substantial impairment in community living arrangement, daily activities, and social relationships. AR 380. In addition to Risperdal and Benadryl, she was prescribed with Colace. AR 355. She received treatment at SCCRP for over three months. *See* AR 360-378. In August 2014, Watson was found to be resistant to take

United States District Court
Northern District of California

United States District Court
Northern District of California

medications and to meet with a male clinician.  AR 361.  She was observed with a flat affect, depressed mood, soft and nonspontaneous speech, halting thought process, poor memory recall, and poor eye contact.  AR 362.  She appeared to be in improved mood and focus in late August and early September.  AR 373.  In the last follow-up appointment in September, Dr. Pyevich changed Watson's medication to Zyprexa and updated her diagnosis to Schizophrenia.  AR 376.

In October 2014, Watson was referred to STARS Behavioral Health Group for further mental health services and stabilization.  AR 493.  The October 2014 MSE reported good hygiene and grooming, within-normal-limit speech, no paranoia, suicidal or homicidal thoughts, good mood, constricted affect, no hallucinations, intact memory, fair judgement and insight.  AR 499.  The MSE also revealed that Watson was logical, coherent, goal directed, calm, pleasant, cooperative, alert, and oriented.  *Id.*  She received treatment at STARS until she was discharged in December 2015 because she aged out of services and had met treatment goals of being compliant with medication, using different coping strategies when symptoms arise, and living independently and managing her symptoms.  AR 512.  The discharge summary indicated that Watson "was getting a better understanding of her mental illness and medications assisted in alleviating symptoms." *Id.*  She was referred to Pathways to Wellness.  *Id.*

On January 14, 2016, Watson had her initial assessment at Pathways to Wellness with Dr. Kapil Chopra.  AR 531.  Dr. Chopra noted that Watson was alert, cooperative, soft spoken, with fine mood, and had an appropriate affect, but that she experienced paranoia "sometimes," had paranoid delusions, and was moderately limited by episodes of decomposition resulting in increased symptoms.  AR 533-34.  Dr. Chopra noted that she presented "with significant impairments in important areas of life functioning, and will likely deteriorate without" her current level of intervention and that "intervention at this level . . . will diminish impairments and prevent further deterioration in life functioning, and will allow the client to progress developmentally as appropriate." AR 535.  Watson continued treatment at Pathways to Wellness until June 2016.  AR 524.  Watson's MSEs, on February 11, April 7, and June 10, 2016, all reported healthy and adequately groomed appearance, cooperative attitude, calm behavior, normal speech, euthymic mood, appropriate affect (except "constricted" in April), no hallucinations, linear thought process,

United States District Court
Northern District of California

within-normal-limit thought content, intact, immediate, recent, and remote memory, good judgment, no danger to self or others, good attention and concentration, good insight, and a "good" prognosis in February but only "fair" in April and June.  AR 523-530.

On October 31, 2016, psychological consultative examiner Dr. Paul Martin performed a Complete Psychological Evaluation on Watson, at the request of the Department of Social Services.  AR 516.  Martin noted that Watson still occasionally hears voices and feels paranoia, despite good compliance with her medicines.  AR 517.  The MSE reported orientation to name, date, time, and place, completely intelligible language, congruent and "okay" mood, no pain, intact sensory with no reported problems with vision or hearing, no suicidal or homicidal ideation, fair attention and fund of knowledge, adequate memory, fair insight and judgment, fair understanding of calculations, abstractions, and proverbs, organized, coherent, linear and goal directed thought process, and no hallucinations or delusions at the time of the exam, but reported past history of both.  AR 518.  The evaluation also indicated intact cognitive functioning and ability for new learning and memory.  AR 519-20.  Dr. Martin diagnosed Watson with Schizophrenia, Multiple Episode and Unspecified Anxiety Disorder and concluded that her prognosis was fair and her "psychiatric symptoms may diminish with mental health treatment, although no significant changes are likely to occur within the next 12 months."  AR 520.  As to work-related abilities, Dr. Martin concluded that, due to symptoms of schizophrenia, paranoia, and anxiety, Watson was markedly limited with ability to perform work activities on a consistent basis, to compete a normal workday or workweek without interruptions resulting from the psychiatric conditions, to interact with coworkers and with the public, and to deal with the usual stresses encountered in the competitive work environment.  AR 520-21.  Watson was moderately limited with maintaining regular attendance in the workplace but was only mildly limited with performing detailed and complex tasks and with ability to perform work activities without special or additional supervision.  AR 520.  She was not significantly limited with performing simple and repetitive tasks or with ability to accept instructions from supervisors.  AR 520-21.

In January 2017, Watson started treatment at The Permanente Medical Group (Kaiser).  The MSE in February 2017 reported mostly normal and similar results as before, except for

restricted affect.  AR 586.  On May 5, 2017, Watson was admitted to the Emergency Department of Kaiser Permanente due to decompensation and complained about hearing voices or sounds.  AR 547.  She was diagnosed with Schizophrenia and was discharged to home.  AR 549.  She was "well-appearing, calm and cooperative" and felt comfortable waiting for medication adjustment as she was "clinically stable and is not gravely disabled."  AR 552.  At her next appointment, on May 9, 2017, Dr. Aman Deep Singh found that Watson had restricted affect, distractible attention, impaired concentration, paranoid ideation and hallucinations, and disorganized thought processes. AR 603.  Dr. Singh recorded that "there has been decompensation in mental status due to non-compliance with medications," because Watson stopped her medications a month prior which resulted in an increase in her paranoid and auditory hallucinations.  AR 602.  Watson had been back on her medications for two weeks and the voices had "improved" by the time Dr. Singh saw her, but she was still having trouble concentrating.  *Id.*    Dr. Singh increased Watson's dosage of Olanzapine and referred her for psychotherapy.  AR 606.

During her office visit in June 2017, Watson reported that she still had auditory hallucinations, but they had "improved," and it didn't "bug her" and she was "able to ignore it." AR 619.  She reported that her paranoia was "a little bit less," but she still had a hard time trusting her husband and believed he was cheating on her.  *Id.*  She described having a "little bit" of suicidal thoughts, and that her thought disorganization had improved "a little bit."  *Id.*  She rated both anxiety and depression at 5/10, with 10 being worse.  *Id.*  The MSE reported that Watson was well-groomed and appropriately dressed, pleasant, cooperative, and fully oriented, with normal language, less disorganized thought processes, within-normal-limit attention, intact recent and remote memory, normal fund of knowledge, and fair impulse control and judgment.  AR 620.  But the MSE also reported psychomotor retardation, echolalia, dysphoric mood, restricted affect, paranoid thoughts, impaired concentrations, and marginal insight.  *Id*.  Dr. Singh prescribed Watson with additional medications (Sertraline) for depressive and anxiety symptoms, in addition to Olanzapine.  AR 622.

Dr. Shuja Jafar-Ali conducted telephone appointments with Watson on June 22, 2017 and July 14, 2017.  In June, Watson reported that she was doing "much better" and still had auditory

hallucinations, but they were not bothering her.  AR 633.  The physician noted that she was "motivated to get better" and felt "much improved" and with a "better mood."  AR 634. Watson's mother committed to helping Watson remain compliant with her medications.  AR 635.  On July 14, 2017, Watson was unable to come to her appointment in person but reported "doing v[ery] well," was still motivated to get better, and had no new or acute psychiatric symptoms.  AR 639. Watson's mother committed again to monitoring Watson's medications and symptoms.  *Id*.

Dr. Singh conducted a telephone appointment on August 3, 2017, during which Watson reported that she had been "doing a little bit better," "anxiety is better," "paranoid thoughts are better," and "thoughts are more organized."  AR 646.  Watson reported that her day consisted of "getting up, reading, caring for her children and playing phone games."  *Id*.  She also reported that her sleep was okay, appetite was good, and auditory hallucinations were less intense and less frequent.  *Id*.  The updated MSE noted improvements in her speech, mood, and thought organization, and that her auditory hallucinations were "minimal" and "not commanding."  AR 647.  Dr. Singh concluded that Watson was doing well and would "benefit from continuing treatment and follow-ups."  *Id*.

Dr. Jafar-Ali had telephone "medication management" appointments with Watson on August 29 and September 25, 2017.  Watson complained of auditory hallucinations in her August 29th appointment, with male voices that were "annoying" but did not create a "safety issue" to her and occurred when falling asleep, when waking up, and occasionally during the day.  AR 652. Dr. Jafar-Ali noted that Watson's medications had been increased on August 19, 2017, "with not much improvement" and there was "room for improvement" with her schizophrenia.  AR 652, 654.

Following a telephone appointment on October 26, 2017, Dr. Singh noted that Watson reported doing well since her medications were increased in August, but that she continues to experience paranoid thoughts, although her auditory hallucinations were "better."  AR 662.  Her MSE was normal, except for paranoid ideation.  AR  663.

### III.    THIRD-PARTY FUNCTION REPORT

Watson's husband completed a Third Party Function Report on October 29, 2014.  Mr.

Watson noted that his wife "has to take medication to function in her daily life" and that "she gets stressed out, [paranoid], and scared at work." AR 199. As to house and yard work, Mr. Watson noted that Watson was able to do light cleaning and some laundry. AR 201. Mr. Watson reported that Watson "used to be extremely friendly [but] now really cautious and paranoid around people." AR 204. Mr. Watson reported that for Watson, "completing anything is a challenge" and "following simple instructions is a [challenge] sometimes." *Id.* Watson also "has short term memory problem" and "zooms out a lot." *Id.* As to the ability to handle stress, Mr. Watson stated that Watson "quits if [too stressful] or just shuts down and [goes] to sleep." AR 205.

## IV.    WATSON'S SUBJECTIVE TESTIMONY

At the hearing, Watson stated that she was not currently working and was not able to work because of her paranoid schizophrenia. AR 41-42. She reported hearing voices "a lot" that sometimes hated her, sometimes loved her, and sometimes told her to do things. AR 44. She testified that the voices occurred in the morning when she woke up and sometimes again, "maybe about one to five times a day." AR 42-44. She indicated that she did not respond to the voices and tried to ignore them. AR 45. She explained that she was taking Alancapin and Sertraline every day, but still heard the voices. AR 45, 55. She testified that nothing else was preventing her from being able to work. AR 45. As to her mood, Watson indicated that she had good and bad days and did not feel like getting up in the morning on bad days. AR 51. She testified to feeling depressed about twice a week. *Id.* She noted that she had trouble trusting other people but was able to deal with strangers. AR 52. She thought her memory was not so good; she has trouble remembering recipes or things she needed to do. *Id.* She testified that it was hard for her to drive or cook because she cannot multitask. AR 59. She testified that she fed her kids, took them to school, and helped them with homework on a daily basis, but that her family members also helped her care for the kids. AR 53. She reported that she washed dishes several times a week and did grocery shopping with her husband. AR 56. She estimated that, twice a week, she did not leave the house at all. AR 56. She testified that she stopped taking medications in May 2017 because she thought she was doing well, but then she felt scared and started hearing music and voices. AR 60.

Watson testified that she worked as a knife salesperson for about five months during a timeframe she could not recall, where she would call people to set up a showing and ask them if they know anybody that might want to buy knives.  AR 46-47.  She stated that she also worked at Toys "R" Us for a day-and-a-half and as a crewmember at McDonald's from April to June 2011 until she became pregnant.  AR 41, 47-48, 50.  She said that she applied for a job at KFC in June 2017 but did not start because she became paranoid and believed that "they were out to get [her]."  AR 42, 50, 57.  She was taking medication on a regular basis at that time.  AR 58.

## V.     VOCATIONAL EXPERT'S TESTIMONY

In response to the ALJ's hypothetical question which assumes "a hypothetical individual with the claimant's age, education and work experience who's able to perform the full range of work" but limited in that "[t]he individual can perform simple/routine/repetitive tasks; can have occasional interaction with the public and frequent interaction with co-workers that does not involve working on teams," the VE testified that the hypothetical individual could work as a merchandise marker, a housekeeper, or a bottle packer.  AR 62-64.  The VE also testified that if the hypothetical individual was absent 20 percent of the time, there would be no potential job for that person.  AR 66.

## VI.    THE ALJ'S DECISION

In his August 15, 2018 decision, the ALJ at Step One concluded that Watson "has not engaged in substantial gainful activity since June 8, 2014, the date [she] became disabled[.]" AR 18.  At Step Two, the ALJ concluded that during the whole period Watson had the following severe impairments: "schizophrenia, multiple episode, currently in partial remission; unspecified anxiety disorder; and major depressive disorder."  AR 18, 24.

However, the ALJ determined that Watson's limitations differed between two periods.  Specifically, he determined that Watson was disabled between June 8, 2014 and January 13, 2016.  But, due to medical improvements related to her ability to work, Watson was not disabled after January 13, 2016.  AR 15.  Therefore, the ALJ considered the evidence and made conclusions regarding Steps Three through Five separately for these two time periods.

For the closed period, at Step Three, the ALJ determined that Watson did not have an

impairment that met or medically equaled a listed impairment as, considering the "paragraph B" factors, Watson had only "a moderate limitation in understanding, remembering, or applying information; a marked limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing oneself." AR 19.

With respect to her RFC for the closed period, the ALJ concluded that Watson had the RFC to perform a full range of work at all exertional levels with limits to performing simple, one to two step, repetitive tasks, with no interaction with the general public and frequent interaction with coworkers that does not involve working on teams. AR 19. However, the ALJ considered that given her mental health symptoms at that time, Watson could not "perform at a production level pace." *Id*.

In considering Watson's symptoms, the ALJ followed a two-step analysis by first determining "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms" and then evaluating "the extent to which the symptoms limit the claimant's ability to function." AR 20. The ALJ considered Watson's allegations of symptoms and restrictions related to her impairment, including her testimony at the hearing. AR 20-21. He concluded that Watson's alleged symptoms and "statements concerning the intensity, persistence and limiting effects of these symptoms" are reasonable based on her medically determinable impairments and "generally consistent" with the medical evidence, including her MSE showing impaired affect, disorganized thoughts, and poor memory, from June 8, 2014 through January 13, 2016. AR 21.

The ALJ then considered opinion evidence. AR 22. He gave "some weight" to Mr. Watson's October 29, 2014 third-party report, where Watson described his wife as "cautious and paranoid around others" and her impairments as affecting "her ability to talk, remember, complete tasks, concentrate, understand, and follow instructions." AR 22. Mr. Watson "relayed that the claimant has difficulty with short-term memory, completing tasks and following even simple instructions." *Id*. He also asserted that his wife "must be reminded to take her medication on a daily basis," that she "is easily confused and speaks so quietly that she can barely be heard," and

9

that she "quits if tasks become too stressful" and "shuts down and goes to sleep." *Id*. The ALJ concluded that "Mr. Watson cannot be considered a disinterested third-party source whose statement would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations she has alleged." *Id*. Nonetheless, the ALJ accepted Mr. Watson's allegations that his wife was "cautious and paranoid around others and that she has difficulty following instructions and completing tasks" as consistent with the evidence of record. *Id*.

The ALJ assigned "partial weight" to the January 13, 2015 opinion of Dr. Elizabeth Covey, a state agency consultant, and the November 23, 2016 opinion of Dr. M. Morando, a state agency consultant because both opinions were "largely consistent with the record." AR 22-23. Dr. Covey found that Watson "was capable of understanding, remembering and carrying out short and simple instructions; of maintaining concentration, persistence and pace for such tasks; of having superficial interaction with supervisors and coworkers; but limited contract with the public; and of adapting appropriately." *Id*. Dr. Morando found that Watson "was capable of following simple instructions and performing simple, routine tasks with limited interaction with the public." *Id*. The ALJ also noted that Watson's MSEs during that period had consistently "shown impaired memory, scattered attention and concentration and mildly impaired judgment," supporting a "limitation of performance to simple, one to two step, routine, repetitive tasks and only frequent interaction with coworkers." AR 23. All of this evidence, "combined with the evidence of depressed mood, constricted and flat affect, hesitant speech, and a halting thought process, supports a restriction against interaction with the general public. [] Additionally, this evidence, as a whole, supports a restriction against any work requiring performance at a production level pace." *Id*.

At Step Four for the closed period, the ALJ found that claimant had no relevant past work. At Step Five, considering her RFC for the closed period, the ALJ concluded that "[f]rom June 8, 2014 through January 13, 2016, considering the claimant's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed[.]" AR 23.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Turning to the following period, after January 13, 2016, the ALJ concluded that "[t]he

2    claimant has not developed any new impairment or impairments since January 14, 2016" and that

3    "the claimant's current severe impairments are the same as that present from June 8, 2014 through

4    January 13, 2016." AR 24. At Step Three for this period, the ALJ determined (consistent with the

5    closed period) that Watson had no impairments that met or equaled a listing. *Id*. Considering the

6    paragraph B criteria for this period, the ALJ determined that Watson had only a mild limitation in

7    understanding, remembering, or applying information, based on her reported mental capacity to

8    complete certain daily tasks, her normal judgement and insight reflected by the medical record,

9    and her displayed memory and knowledge. AR 25. He found that Watson had a moderate

10   limitation in interacting with others because she could communicate clearly, interacted with family

11   members, and was described by medical providers as cooperative. *Id*. He determined that Watson

12   had moderate limitation in concentrating, persisting, or maintaining pace because she engaged in

13   "many activities of daily living that invariably call for some degree of concentration" and because

14   "treatment records consistently showed the claimant was alert and oriented to person, place, and

15   time." *Id*. Finally, he concluded that Watson had a moderate limitation in adapting or managing

16   herself, because she indicated that she was capable of managing daily routine and maintaining

17   personal hygiene mostly by herself and because "treatment notes routinely indicated she had

18   appropriate mood and affect during exams." *Id*. Given that Watson's mental impairments did not

19   cause at least two marked limitations or one extreme limitation, the "paragraph B" criteria were

20   not satisfied. *Id*.

21   The ALJ then explained the basis for his conclusion that medical improvement occurred

22   and Watson's disability ended as of January 14, 2016. AR 26-27. He first noted that Watson's

23   MSE's in January through April 2016 were normal and Watson was "stable" on her antipsychotic

24   medications. AR 26.

25   The ALJ then considered the results of Dr. Martin's psychological consultative

26   examination from on October 31, 2016. While the examining consultant diagnosed Watson with

27   schizophrenia, multiple episode, currently in partial remission and unspecified anxiety disorder,

28   the ALJ emphasized Martin's MSE findings, namely that Watson had full orientation, "okay"

United States District Court
Northern District of California

mood, congruent affect, fair attention and fund of knowledge, adequate memory, fair insight and judgment, and organized, coherent, linear, and goal directed thought process. AR 26.  The ALJ noted that Watson "denied current hallucinations or delusions." AR 26.  He noted that the tests performed by Martin revealed essentially intact cognitive functioning and ability for new learning and memory.  *Id.*

The ALJ considered Watson's report in February 2017 that "her medication decreased her auditory hallucinations and improved her paranoia and speech" and that "she had run out of medication two weeks previously." AR 26.  Her symptoms were "well controlled at the time," and she "reported no mental health related symptoms." *Id.*  The ALJ also considered her emergency treatment at Kaiser in May 2017.  *Id.*  He noted that Watson complained of paranoia and "reported that she had stopped taking medication for a month but started again three weeks ago" due to increased paranoia.  AR 26-27.  He added that Watson and her husband "both felt comfortable waiting for" an upcoming appointment with the psychiatrist to discuss medication adjustment, and Watson "was discharged in improved condition with no additional medication[.]" AR 27.  He acknowledged that during the following psychiatric appointment, Watson reported continued paranoid thoughts and trouble concentrating.  *Id.*  She also reported auditory hallucinations which had improved since she resumed medication.  *Id.*  The ALJ also discussed the MSE results and noted that she was not willing to increase her medication dosage at the point.  *Id.*

The ALJ further considered Watson's reports and MSEs from June to October 2017.  He noted that in June 2017, Watson "reported experiencing symptoms of depression and anxiety, rating each as a five out of ten." *Id.*  "She exhibited a dysphoric mood and marginal insight, but showed improvement in latency and poverty of speech, less disorganized thought processes and attention within normal limits[.]" *Id.*  In July 2017, she "reported no new psychiatric symptoms, and reported feeling well, emotionally healthy and stable," noting that "her auditory hallucinations were less intense and frequent and that her paranoid thoughts were better[.]" *Id.*  In August 2017, the ALJ noted Watson's reported improvement in her anxiety symptoms, but her dosage of antipsychotic medication was increased later in the month after she complained of continued auditory hallucinations, which she "described as annoying." *Id.*  He finally noted that "[b]y

1    October 2017, the claimant reported that she was doing well overall with her current medication

2    regimen." *Id.*

3            Characterizing that evidence as indications of improvement, the ALJ determined that

4    beginning January 14, 2016, there was an increase in Watson's RFC "for basic work activities,"

5    such that after that date she could perform a full range of work at all exertional levels but with

6    certain non-exertional limitations.  AR 27-30.  The ALJ's RFC for this period was identical to the

7    prior period, except that Watson's inability to "perform at a production level pace" was no longer

8    present.  AR 28.

9            The ALJ first acknowledged that "[a]lthough the claimant demonstrated improvement in

10   her mental symptoms while being compliant with her medication regimen, she continued to report

11   auditory hallucinations and paranoid thoughts" and "reported symptoms related to anxiety and

12   depression." AR 28.  He reasoned that "no more restrictive limitations are needed" because,

13   despite Watson's alleged "continuing auditory hallucinations and occasional paranoid thoughts

14   even while compliant with medication[,]" her MSEs after January 13, 2016 "have routinely

15   shown" that she was "cooperative, friendly and fully oriented, with normal affect, speech, thought

16   process and thought content" and had "adequate judgment and insight, intact recent and remote

17   memory and normal attention and concentration."  *Id*.  He added that Watson "has also reported to

18   her mental health providers that medication improved her symptom, and that she was doing well

19   overall on her current medication regimen[.]" *Id*.

20           Considering Watson's statements about the intensity, persistence, and limiting effects of

21   her symptoms, the ALJ concluded "the claimant's medically determinable impairments could

22   reasonably be expected to produce" her alleged symptoms, but her "statements concerning the

23   intensity, persistence and limiting effects of these symptoms are not entirely consistent" with the

24   evidence because she was not as restricted as she claimed.  AR 28  He pointed out that "the

25   claimant has engaged in a somewhat normal level of daily activity and interaction" and found that

26   "some of the physical and mental abilities and social interactions required in order to perform

27   these activities are the same as those necessary for obtaining and maintaining employment." *Id*.

28   His examples of such transferrable daily life activities ("DLR") included Watson's "light

United States District Court
Northern District of California

United States District Court
Northern District of California

1    housecleaning, preparing simple meals, making change, using public transportation, going to the

2    grocery store, and caring for her children[.]" *Id.* He found that "the claimant's ability to

3    participate in such activities is inconsistent with her allegations of functional limitations." *Id.*

4        As for the opinion evidence, the ALJ gave "great weight" to Dr. Chopra's January 14,

5    2016 opinion – based only in Dr. Chopra's initial intake assessment – that "the claimant had no

6    limitation in activities of daily living, mild limitation in maintaining social

7    functioning/relationships, mild limitation in maintaining concentration, persistence or pace, and

8    moderate limitation with episodes of decompensation and increase of symptoms, each of extended

9    duration" because it was consistent with Dr. Chopra's notes and findings, and with Watson's

10   "report that she has no issues performing her activities of daily living." AR 29. The ALJ afforded

11   "partial weight" to Dr. Martin's opinion of October 31, 2016. "Dr. Martin noted that the claimant

12   had difficulty sustaining consistent levels of attention due to symptoms of schizophrenia and

13   anxiety, easily becomes overwhelmed and has difficulty with consistent performance." *Id.* Dr.

14   Martin "opined that the claimant would be markedly limited with the ability to perform work

15   activities on a consistent basis, to complete a normal workday and workweek without interruptions

16   resulting from her psychiatric condition, to interact with coworkers and with the public and to deal

17   with the usual stresses encountered in a competitive work environment" and that "the claimant

18   would be moderately limited in the ability to maintain regular attendance in the workplace and

19   mildly limited in the ability to perform detailed and complex tasks and to perform work activities

20   without special or additional supervision." *Id.* The ALJ reasoned that "Dr. Martin's opinion as to

21   Watson's marked and moderate limitations "are inconsistent with the results of his examination"

22   and "with the claimant's test scores," whereas Dr. Martin's opinion as to no significant limitations

23   in Watson's ability to perform simple and repetitive tasks and to accept instructions from

24   supervisors was "supported by this evidence." *Id.*

25       The ALJ recognized Watson's continued "distracting auditory hallucinations and paranoid

26   thoughts," but concluded that her RFC had improved so that she could now "perform at a

27   production level pace," and at Step Five, concluded "jobs exist in significant numbers in the

28   national economy that the claimant can perform[.]" AR 28-30.

14

United States District Court
Northern District of California

**LEGAL STANDARD**

**I.      DISABILITY DETERMINATION**

A claimant is "disabled" as defined by the Social Security Act if: (1) "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 1382c(a)(3)(A)-(B); *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012).  To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the first two steps of the evaluation, the claimant must establish that he or she (1) is not performing substantial gainful activity, and (2) is under a "severe" impairment. *Id.* § 416.920(a)(4)(i)-(ii).  An impairment must have lasted or be expected to last 12 months in order to be considered severe. *Id.* § 416.909.  In the third step, the claimant must establish that his or her impairment meets or medically equals a listed impairment described in the administrative regulations.  *Id.* § 416.920(a)(4)(iii).  If the claimant's impairment does not meet or equal one of the listed impairments, before proceeding to the fourth step, the ALJ is to make a residual functional capacity determination based on all the evidence in the record; this determination is used *to* evaluate the claimant's work capacity for steps four and five.  *Id.* § 416.920(e).  In step four, the claimant must establish that his or her impairment prevents the claimant from performing relevant work he or she did in the past. *Id.* § 416.920(a)(4)(iv).  The claimant bears the burden to prove steps one through four, as "[a]t all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits."  *Id.* (alterations in original).  Once the claimant has established this prima facie case, the burden shifts to the Commissioner to show at the fifth step that the claimant is able to do other work, and that there are a significant number of jobs in the national economy that the claimant can do.  *Id.* §§ 416.920(a)(4)(v), (g); 416.960(c).

"A Social Security disability benefits claimant is no longer entitled to benefits when substantial evidence demonstrates (1) 'there has been any medical improvement in the [claimant's] impairment' and (2) the claimant 'is now able to engage in substantial gainful activity.'" *Attmore v. Colvin*, 827 F.3d 872, 873 (9th Cir. 2016) (quoting 42 U.S.C. § 423(f)(1)). "To determine whether there has been medical improvement, an administrative law judge (ALJ) must 'compare the current medical severity' of the claimant's impairment to the medical severity of the impairment 'at the time of the most recent favorable medical decision that [the claimant] w[as] disabled or continued to be disabled.'" *Id*. (quoting 20 C.F.R. § 404.1594(b)(7)).

## II.      STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I review the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and free of legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991) (ALJ's disability determination must be supported by substantial evidence and based on the proper legal standards). Substantial evidence means "'more than a mere scintilla,' but less than a preponderance." *Saelee v. Chater*, 94 F.3d 520, 521-22 (9th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (internal quotation marks and citation omitted).

I must review the record as a whole and consider adverse as well as supporting evidence. *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 882 (9th Cir. 2006). Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Morgan v. Comm'r of the Soc. Sec. Admin*., 169 F.3d 595, 599 (9th Cir. 1999). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Robbins*, 466 F.3d at 882 (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

## DISCUSSION

Watson raises a number of challenges to the ALJ's determination that medical improvement occurred as of January 14, 2016. The Commissioner opposes, arguing that the

United States District Court
Northern District of California

ALJ's decision of medical improvement is based on substantial evidence and is free of reversible error.

# I.     BROADER CONTEXT OF PLAINTIFF'S IMPAIRMENTS

Watson argues that in finding medical improvement as of January 14, 2016, the ALJ failed to adequately compare medical evidence from the closed period of disability with medical evidence from the point of medical improvement in the "broader context" of plaintiff's ongoing schizophrenia and anxiety disorder.  Plaintiff's Motion for Summary Judgment ("Pl.'s Mot.") [Dkt. No. 18] 9.  Watson also contends that the ALJ cherry-picked medical evidence from January 2016 through August 2017, and when all the evidence is considered there is insufficient evidence of medical improvement in that broader context.  *Id.* 10.

In closed period cases, "where the ALJ finds in a *single* decision that the claimant was disabled for a closed period of time but has since medically improved," the ALJ "should compare the medical evidence used to determine that the claimant was disabled with the medical evidence existing at the time of asserted medical improvement."  *Attmore*, 827 F.3d at 874 (emphasis in original).  "Medical improvement is any decrease in the medical severity of [a recipient's] impairment(s) . . . and is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)."  20 C.F.R. § 404.1594(c)(1).  "An ALJ cannot simply pick out a few isolated instances of improvement over a period of months or years but must interpret reports of improvement . . . with an understanding of the patient's overall well-being and the nature of her symptoms."  *Attmore*, 827 F.3d at 877 (citing *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)) (internal quotation marks omitted).

With respect to mental impairments with symptoms that "wax and wane over time," the ALJ cannot "find medical improvement on [the basis of isolated signs of improvement] unless the ups and the downs of [the patient]'s development showed *sustained* improvement."  *See id.* at 878 (citing 20 C.F.R. § 404.1594(b)(1)) (emphasis in original).  "Reports of improvement in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms."  *Garrison*, 759 F.3d at 1017 (internal quotation

United States District Court
Northern District of California

1   marks and citation omitted).  "They must also be interpreted with an awareness that improved

2   functioning while being treated and while limiting environmental stressors does not always mean

3   that a claimant can function effectively in a workplace."  *Id.*  "Caution in making such an

4   inference is especially appropriate when no doctor or other medical expert has opined, on the basis

5   of a full review of all relevant records, that a mental health patient is capable of working or is

6   prepared to return to work." *Id.* at 1017-18.

7       Watson argues that the ALJ failed to satisfy these requirements.  He did compare the

8   MSEs between the closed period and the following period, and those MSEs showed improvement

9   with respect to her mental status during those same-day examinations.  But he failed to explain

10  how and why there was sufficient improvement in her ongoing schizophrenia and anxiety disorder

11  that translated to an improved ability to work.  I agree with Watson.

12      The ALJ failed to provide any explanation, and failed to identify medical or opinion

13  evidence in the record to support his conclusion that Watson's RFC improved to the extent that as

14  of January 2016 and thereafter Watson could "perform at a production level pace" despite her

15  ongoing auditory hallucinations and anxiety.  While the ALJ acknowledged both that Watson had

16  ongoing issues and that she decompensated in mid-2017 (primarily due to her failure to stay on

17  her medication), he did not fully address the broader context or identify evidence of a "sustained"

18  improvement.  Putting aside the one incident of decompensation, the evidence throughout 2016

19  and 2017 showed Watson's treating physicians were still adjusting her medications, referring her

20  for different and additional treatment, and noting that there was still room for significant

21  improvement with respect to her ongoing auditory hallucinations, anxiety, and paranoia.  The

22  ALJ's exclusive reliance on the improvement in the MSEs in 2016 cannot (contrary to the

23  defendant's arguments) support a finding of *sustained* improvement in light of the broader context

24  of the record showing the continuing existence of Watson's auditory hallucinations, anxiety, and

25  paranoia.

26  **II.     TREATING PHYSICIAN'S OPINIONS**

27      Watson also argues that the ALJ erred by rejecting both her treating and the examining

28  clinicians' opinions that she continued to experience significant limitations from her ongoing

United States District Court
Northern District of California

18

1  symptoms after January 14, 2016.  Pl.'s Mot. 16.

2       The Ninth Circuit distinguishes between three types of physicians that provide information

3  about a claimant: "(1) those who treat the claimant (treating physicians); (2) those who examine

4  but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat

5  the claimant (non[-]examining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995),

6  *as amended* (Apr. 9, 1996).  Generally, the opinion of a treating physician is entitled to greater

7  weight than the opinion of a non-treating physician. *Id*.; 20 C.F.R. § 404.1527(d)(2).  However, a

8  treating physician's opinion "is not binding on an ALJ with respect to the existence of an

9  impairment or the ultimate determination of disability."  *Tonapetyan v. Halter*, 242 F.3d 1144,

10  1148 (9th Cir. 2001) (citation omitted).  To properly reject the opinion of a treating or examining

11  doctor when it is uncontradicted by another doctor, the ALJ must state "clear and convincing

12  reasons" for doing so.  *Lester*, 81 F.3d at 830.  If the treating or examining physician's opinion is

13  contradicted by another physician, however, an ALJ may reject the treating or examining

14  physician's opinion if she states "specific and legitimate reasons" that are supported by substantial

15  evidence.  *Id*. at 830–31.

16       If a treating physician's opinion is not given "controlling weight" because it is not "well–

17  supported" or because it is inconsistent with other substantial evidence in the record, the SSA

18  considers specified factors in determining the weight it will be given.  Those factors include the

19  "[l]ength of the treatment relationship and the frequency of examination" by the treating physician

20  and the "nature and extent of the treatment relationship" between the patient and the treating

21  physician. *Orn*, 495 F.3d at 631.

22       **A.      Dr. Martin**

23       Watson asserts that the ALJ erred by accepting psychological consultative examiner Dr.

24  Martin's opinions regarding her mild limitations but rejecting his opinions as to her marked and

25  moderate limitations.  Pl.'s Mot. 18.  Defendant disagrees, contending that the ALJ was entitled to

26  reject the marked and moderate limitations because "Dr. Martin's opinion[s] of marked and

27  moderate limitations were not supported by his own examination findings or by other medical

28  evidence in the record."  Def.'s Mot. 12.

United States District Court
Northern District of California

United States District Court
Northern District of California

1        In his decision, the ALJ rejected Dr. Martin's October 2016 conclusions that due to

2   Watson's symptoms from her schizophrenia, paranoia, and anxiety disorders she was "markedly

3   limited" in her ability to perform work activities on a consistent basis, to compete a normal

4   workday or workweek without interruptions resulting from the psychiatric conditions, to interact

5   with coworkers and with the public, and to deal with the usual stresses encountered in the

6   competitive work environment.  AR 29; AR 520-21.  The ALJ also rejected Dr. Martin's opinion

7   that Watson was "moderately limited" due to the same symptoms in maintaining regular

8   attendance in the workplace.  *Id*.  The ALJ concluded that these opinions were "inconsistent with

9   the results of [Martin's] examination, which indicated full orientation, normal mood and affect,

10  organized, coherent, linear and goal directed thought processes, average attention and fund of

11  knowledge and fair insight and judgment" and that "[t]his opinion is also inconsistent with the

12  claimant's test scores indicating intact cognitive functioning, intact ability for new learning and

13  memory and no significant difficulty with sustained attention and mental tracking."  AR 29.

14       I agree with Watson that Dr. Martin's examination results and test scores from the one-

15  time examination are not in conflict with Dr. Martin's opinions concerning Watson's work-related

16  limitations stemming from the ongoing symptoms of her schizophrenia, paranoia, and anxiety

17  disorders.  The examination findings and tests identified by the ALJ "do not speak to her ability to

18  control her symptoms in the workplace." Pl's Mot. 17.  The ALJ did not explain or identify any

19  medical or opinion evidence in the record to contradict Dr. Martin's conclusions as to her marked

20  and moderate limitations *based* on the undisputed diagnoses of her schizophrenia and anxiety

21  disorders nor did he otherwise explain how the marked and moderate limitations identified by

22  Martin in work-related abilities are contradicted by the "snapshot" of an MSE or the cognitive

23  testing conducted by the ALJ.  Dr. Martin's MSE (as the other MSEs in the record) and the

24  cognitive tests look to Watson's presentment on the examination date and to her general cognitive

25  ability.  They do not contradict the ample evidence of ongoing auditory hallucinations and

26  paranoid thoughts, as recognized by Dr. Martin and Watson's medical providers, which required

27  ongoing medical and treatment adjustments throughout 2016 and 2017.

28       The ALJ failed to appropriately consider and weigh the limitations found by Dr. Martin.

### B.     Dr. Singh and Dr. Jafar-Ali

Watson argues that the ALJ failed to consider any of the opinions of treating providers Dr. Singh and Dr. Jafar-Ali who, throughout 2017, found that Watson continued to suffer significant symptoms from her schizophrenia, paranoia, and anxiety disorders.  Pl.'s Mot. 18.  Defendant notes, first, that these providers did not give any opinions regarding Watson's functional limitations.  Def.'s Mot. 13.  Defendant also notes that in his opinion the ALJ considered the evidence from these medical records and appropriately concluded that they did not contradict his conclusion of sufficient medical improvement.

I agree with defendant that these two providers gave no formal "opinions" concerning Watson's limitations that the ALJ failed to consider.  However, as noted above, the ALJ failed to appropriately weigh and consider their treatment notes and the evidence of continued adjustment to medications and treatments imposed by them to sustain his conclusion that Watson's symptoms improved sufficiently in the broader context of her overall functioning.  The ALJ is required to appropriately weigh this evidence in the broader context on remand.

### C.     Dr. Chopra

Finally, Watson contends that the ALJ mischaracterized Dr. Chopra's January 14, 2016 opinion on which he relied in determining significant improvement as of January 2016 by failing to address and discuss the part of form indicating that despite her normal MSE on that date Watson "presents with significant impairments in important areas of functioning and will likely deteriorate without this level of intervention" and that "this mental health condition could not be treated at a lower level of care or by physical health care treatment."  Pl.'s Mot. 19 (citing AR 535) (internal quotation marks omitted).  Defendant responds that in the same area of the form Dr. Chopra also checked the box indicating that "[i]ntervention at this level . . . will diminish impairments and prevent further deterioration in life functioning, and will allow the client to progress developmentally as appropriate."  Def.'s Mot. 11.  That statement, according to the defendant, supports the ALJ's determination that as of that date Watson had significantly improved and is consistent with Dr. Chopra's treatment notes over the next few months.

I do not need to address the dueling contentions about the significance of these form

"check box" responses.  While I question the significance of this particular form because Dr. Chopra filled it out during his initial visit with and assessment of Watson, the errors I have already identified above are sufficient to require remand for further consideration and explanation of the evidence by the ALJ.

### III.   PLAINTIFF'S SUBJECTIVE TESTIMONY

Watson also argues that the ALJ improperly discounted her testimony about the impact the ongoing symptoms (the hallucinations, paranoia, and anxiety) have on her daily life activities and her inability to work.  An ALJ is required to conduct a two-step analysis to assess credibility of a claimant's testimony regarding subjective pain or symptoms.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Id.* at 1036 (internal quotation marks and citation omitted); *see* 20 C.F.R. § 416.929(a).  "The claimant, however, need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id.* (internal quotation marks and citation omitted).  "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear, and convincing reasons for doing so."  *Id.* (internal quotation marks and citation omitted).  Statements about the intensity and persistence of pain or other symptoms or about the effect of the symptoms on ability to work should not be rejected "solely because the available objective medical evidence does not substantiate [the] statements."  20 C.F.R. § 416.929(c)(2).

The ALJ concluded that Watson's medically determinable impairments could reasonably be expected to produce the alleged symptoms. Therefore, he needed to provide "specific, clear, and convincing reasons" to discredit her testimony.  Watson argues that the ALJ failed to "provide clear and convincing reasons for rejecting [her] statements about her symptoms and limitations after January 14, 2016."  Pl.'s Mot. 20.

Defendant contends that the ALJ properly discredited Watson's symptom complaints

22

1  because they were inconsistent with objective medical evidence, primarily the MSEs, that

2  "routinely showed unremarkable findings."  Def.'s Mot. 15.  However, as discussed above, the

3  ALJ's reliance on the MSEs were not an adequate basis to reject the limitations imposed by Dr.

4  Martin that were arguably consistent with Watson's own testimony about her inability to work

5  given her ongoing hallucinations and paranoia.  The ALJ failed to show or explain how the

6  improved MSEs translated to an improved ability to function in the workplace at adequate

7  production level and pace given the broader context of Watson's ongoing auditory hallucinations

8  and paranoia.  The ALJ will need to reweigh Watson's testimony or provide a different basis on

9  which to discount it on remand.[1]

10  I need not consider Watson's remaining arguments regarding the RFC following the closed

11  period and the ALJ's alleged failure to including all appropriate limitations in the questions posed

12  to the Vocational Expert.  The ALJ's conclusions concerning Watson's RFC following the closed

13  period and the questions submitted to the VE were both impacted by the errors identified above,

14  and will need to be addressed on remand.

## CONCLUSION

16  For the reasons above, I GRANT Watson's motion for summary judgment, DENY

17  defendant's motion for summary judgment, and REMAND the case for further proceedings

18  consistent with this Order.

19  **IT IS SO ORDERED.**

20  Dated: September 8, 2020

William H. Orrick
United States District Judge

---

[1] Watson also argues that the ALJ improperly discounted the testimony of her husband.  Pl.'s Mot. at 23-24.  As defendant notes, the only third-party statement in the record was one from Watson's husband signed in October 2014, during the closed period for which benefits were awarded. Defendant disputes the relevance of the husband's 2014 testimony for the period after January 2016.  Watson argues in reply that the testimony as issue is not the October 2014 statement per se, but reports from the husband made to Watson's providers during and after the closed period (as noted in the medical provider treatment notes) that support Watson's subjective testimony about the waxing and waning nature of her symptoms and continued risk of decompensation.  Reply at 12.  This argument is tied to the ALJ's treatment of Watson's subjective testimony and need not be separately considered.